IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

UNITED STATES OF AMERICA,

Plaintiff,

vs.

DONALD RICHARD CRANE,

Defendant.

No. CR14-0110

REPORT AND RECOMMENDATION

TABLE OF CONTENTS

*I.*   *INTRODUCTION*  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

*II.*   *PROCEDURAL HISTORY* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

*III.*   *RELEVANT FACTS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2
    *A.*   *Events on August 5, 2014* . . . . . . . . . . . . . . . . . . . . . . . . .  2
    *B.*   *Conversation with Jailer* . . . . . . . . . . . . . . . . . . . . . . . . .  7
    *C.*   *Interview on August 6, 2014* . . . . . . . . . . . . . . . . . . . . . .  8

*IV.*   *DISCUSSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9
    *A.*   *Statements at the Scene* . . . . . . . . . . . . . . . . . . . . . . . . .  9
    *B.*   *Vehicle Search* . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10
        *1.*   *Inventory Search* . . . . . . . . . . . . . . . . . . . . . . . .  10
        *2.*   *Search Incident to Arrest* . . . . . . . . . . . . . . . . . . .  13
        *3.*   *Alternative Arguments* . . . . . . . . . . . . . . . . . . . .  14
    *C.*   *Statements to Deputy VanBennekom* . . . . . . . . . . . . . . . . .  15
    *D.*   *Statements to the Jailer* . . . . . . . . . . . . . . . . . . . . . . . .  18

*V.*   *SUMMARY* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20

*VI.*   *RECOMMENDATION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  21

## I. INTRODUCTION

On the 16th day of December 2014, this matter came on for hearing on the Motion to Suppress Statements and Fruits of Warrantless Search (docket number 26) filed by the Defendant on December 3, 2014. The Government was represented by Special Assistant United States Attorney Ravi T. Narayan. Defendant Donald Richard Crane appeared in person and was represented by his attorney, Mark C. Meyer.

## II. PROCEDURAL HISTORY

On October 30, 2014, Defendant Donald Richard Crane was charged by Indictment with possession of a firearm by a felon. Defendant appeared on November 5 and entered a plea of not guilty. Trial was scheduled before Chief Judge Linda R. Reade on January 5, 2015.

On December 3, 2014, Defendant timely filed the instant motion to suppress. The Government filed its resistance on December 12. With the Court's permission, both parties filed supplemental briefs on December 19. Because of the pending motion to suppress, the trial was continued to February 17, 2015.

## III. RELEVANT FACTS

### A. Events on August 5, 2014

At approximately 7:15 a.m. on August 5, 2014, the Iowa County Sheriff's dispatcher received a 911 call, reporting a possible intoxicated driver at the Casey's store near exit 225 on Interstate 80.[1] The caller reported a parked Suburban with its door open and the engine running for more than an hour. When the caller went to investigate, he found the driver "passed out" in the grass behind his vehicle. According to the caller, there were "beer bottles all over in his vehicle." When the caller tried to wake the driver, he "got up and basically crawled to his vehicle." The caller expressed concern that the

---

[1] A recording of the 911 call was introduced as Defendant's Exhibit A.

driver was intoxicated and may try to drive off. The dispatcher asked if the driver appeared to need any medical attention. The caller responded "yeah, I'm not sure."

Iowa County Deputy Sheriff Douglas VanBennekom responded to the scene, arriving at around 7:30 a.m.[2] As VanBennekom pulled into Casey's, he observed a vehicle matching the description given by the 911 caller parked away from the building near the edge of the paved parking area. According to VanBennekom, the vehicle was parked in an area used by drivers to get from the Casey's store to a nearby hotel.[3] The headlights of the vehicle were on and the engine was running. The driver was sitting behind the steering wheel, and there were no other persons in the vehicle.

Deputy VanBennekom got out of his patrol car and approached the driver's side of the parked vehicle. According to VanBennekom, the driver appeared to be sleeping. VanBennekom knocked on the driver's window, but received no response. VanBennekom testified that he then opened the door to check on the driver's welfare. It was necessary to "shake" the driver in order to wake him.

Deputy VanBennekom told the driver that "I'm shutting your vehicle off and I'm taking your keys out, okay?" The driver can be heard responding, but the words appear to be slurred and difficult to understand. VanBennekom then asked the driver twice "have you got an ID on you?" Again, I am unable to determine Defendant's response from listening to the recordings. At about that time, VanBennekom removed an open bottle of beer from the cup holder and placed it on the vehicle's hood. The driver then partially exited the vehicle, placing his feet on the ground.

_____

[2] Video recordings of what happened next were introduced as Government's Exhibits 1 and 2. Exhibit 1 is a video recording from VanBennekom's patrol car, facing forward; while Exhibit 2 is a video recording facing backward, and showing the interior of VanBennekom's patrol car.

[3] VanBennekom's testimony appears to be supported by the video recording, which shows a nearby parking curb.

Trooper Jonathan Degen of the Iowa State Patrol appeared at that time and approached the vehicle. Deputy VanBennekom asked "do you even have a driver's license," and the driver apparently said "no." VanBennekom continued to ask the driver questions, including "how did you get here," "how much have you had to drink," "whose vehicle is this," and "when was the last time you had a drink?" The driver responded to some of the questions, and admitted "I drove." His other responses are difficult to understand from the video recordings.

Deputy VanBennekom then accompanied the driver back to the patrol car, where he was placed in the front passenger seat. The video recording shows the driver unsteady on his feet. Before reaching the patrol car, VanBennekom told the driver that he was going to "pat you down" and asked if he had anything in his pockets "that's going to stick me." Trooper Degen then asked the driver if the registration for the vehicle was in the glove box. The driver responded "more than likely." Degen then went to the subject vehicle, opened the passenger door, and began looking in the glove box.

While Trooper Degen was looking in the glove box, Deputy VanBennekom called in the identification information to the Iowa County Sheriff's dispatcher.[4] The dispatcher told VanBennekom that the identification number came back to Donald Crane, who was "barred" and had convictions for driving while suspended, being an habitual offender, and nonpayment of a fine. VanBennekom advised the dispatcher that he would be "testing" and Degen was on the scene and assisting. After about 2-1/2 minutes of looking in the glove box, Degen appears to bring documents from the vehicle back to the patrol car. Degen then returns to the passenger side of the vehicle, where he continues to look for several minutes.

---

[4] The record is unclear regarding where VanBennekom obtained the identification number, but I assume the driver provided some sort of identification card.

Approximately six minutes into the stop, Deputy VanBennekom asked Defendant "did you get an OWI a while back up by Millersburg?" While Defendant is difficult to understand, he apparently denies an OWI near Millersburg, but appears to admit an OWI in Johnson County. The remainder of Defendant's answer is unresponsive and difficult to understand. VanBennekom also asks Defendant "where's Connie," but does not appear to get a response.

At that point, Deputy VanBennekom asked Defendant "are you going to be able to do some tests for me," and Defendant replied "what tests do you want?" VanBennekom then administered the horizontal gaze nystagmus test. At the hearing, VanBennekom testified that Defendant "showed all six clues." VanBennekom asked Defendant "do you want to try the walk and turn," but Defendant was resistive, raising his voice, and talking about going to jail. No further field sobriety tests were conducted.

Approximately nine minutes into the stop, Deputy VanBennekom returned to the vehicle and poured out the beer remaining in the bottle which was earlier removed from the vehicle. Trooper Degen approached and asked VanBennekom "do you want that vehicle inventoried?" VanBennekom responded that "he's very intoxicated." Degen then told VanBennekom "there's targets in there too; I wonder if he has a gun in there." VanBennekom then asked Defendant "do you have any firearms in your vehicle?" Defendant's answer was difficult to understand and appeared unresponsive. VanBennekom then asked "can we take a look through your vehicle?" Defendant appeared to respond "I don't care; I can't stop you if I wanted to; I don't want to; I've got nothing to hide."

Trooper Degen then asked Deputy VanBennekom "do you want to tow it?" VanBennekom responded "let me do my PBT first and then I'll call for that." VanBennekom continued to question Defendant. VanBennekom asked "so what was going on last night that you were drinking so much; fighting with your wife?" Defendant's answer is difficult to understand. VanBennekom asked "how much did you have to drink

5

last night?" Again, the answer is difficult to understand. VanBennekom asked Defendant "anything else to drink? whiskey or anything?" Defendant responded "no, whiskey makes me an asshole." Defendant also explained at that time that "I don't speak very good because I don't have teeth." While VanBennekom continued questioning Defendant, Degen began an inventory of the vehicle's contents.

Deputy VanBennekom then asked: "anyone with you last night, at all?" Defendant's response is not understandable. VanBennekom asked "did you take too many pain pills?" Defendant made some reference to hydrocodone. At that point, Trooper Degen walked back to the patrol car and advised VanBennekom that he found a firearm in the console. Defendant was asked "do you have a weapons permit?" And he responded "no." VanBennekom then walked up to the vehicle and told Degen that Defendant had mentioned a "blue bag" with his medication. After a quick search, VanBennekom returned to the patrol car and asked Defendant "who uses the syringes?" Defendant responded "my wife's diabetic." Degen continued inventorying the vehicle's contents.

At that point, approximately 19 minutes into the stop, Deputy VanBennekom asked Defendant to submit to a preliminary breath test (PBT). After some back-and-forth, Defendant refused. VanBennekom then handed Defendant a phone to call his wife and told Defendant "the vehicle is going to Iowa County impound." Defendant apparently tried to call his wife, but appeared on the video recording to be leaving a message on an answering machine. While Defendant was calling his wife, VanBennekom went back to the vehicle and looked in the driver's side for about 15 seconds.

Deputy VanBennekom then returned to the vehicle and asked "who is Robert Kruse?" Defendant told VanBennekom that Kruse is his brother. VanBennekom then asked "why do you have his Visa card?" While Defendant's response is not entirely understandable, it appears to have something to do with cleaning up furniture the day before. VanBennekom and Trooper Degen then discussed the details of having the vehicle

6

towed. At that time, approximately 25 minutes into the stop, VanBennekom left the scene to drive Defendant to the Iowa County Jail, and the video recording stopped.

Trooper Degen testified that he stayed at the scene and coordinated the towing of the vehicle to the Iowa County impound lot. Prior to the vehicle being towed, Degen conducted an inventory of the vehicle's contents, pursuant to the procedures adopted by the Iowa State Patrol. A copy of the impoundment and inventory procedures was introduced at the hearing as Government's Exhibit 4, and a copy of the vehicle towing and impound report prepared by Degen was introduced as Exhibit 5.

### B. Conversation with Jailer

Also testifying at the suppression hearing was Jimmy Roberts, a part-time transport officer and jailer at the Iowa County Jail. Roberts testified that he began working at the jail in April 2014 and received on-the-job training. His prior experience is farming.

Roberts reported to work at 11:00 p.m. on August 5. There were 14 inmates in the jail, including Defendant. Defendant was being held in the "dry-out tank" and Roberts was instructed to check on him every 15 minutes. During the first several times that Roberts checked on Defendant, he appeared to be "agitated" and "twitching" while sleeping. When Roberts checked at 3:15 a.m., however, Defendant was sitting up, and Roberts decided to enter the cell and ask if he was okay.

According to Roberts, he did not ask Defendant any questions about the pending charges and, in fact, had not looked at the file and did not know the nature of the charges. According to Roberts, however, Defendant volunteered information regarding selling a gun and his meth use. Roberts then entered the statements in the jail inmate observation log.

> Crane Ok. He's talked to me very cooperative. He told me
> he was waiting for someone to sell his gun. He also admitted
> that he was using METH because of his cancer. Taking him
> off 15 Min watches, but still going to keep an eye on him.

Jail Inmate Observation Log (Government's Exhibit 6). When he left work at approximately 7:00 a.m., Roberts reported the entry to the jailer on duty.

Following the hearing, with the Court's permission, Defendant offered the Jail Inmate Observation Log for August 5 — the day Defendant was arrested.[5] The log confirms that Defendant was booked into jail at about 8:30 a.m. He was checked every 15 minutes. At 5:15 p.m., Defendant "woke up and demanded his medications." When the jailer refused, Defendant "proceeded to punch the door and walls several times." The jailer warned him to stop and Defendant laid down. At 9:15 p.m., a PBT was apparently administered, which registered .00. According to the log entry, however, Defendant "[s]till is acting in a very strange manner. . . . He is very irate."

## C. Interview on August 6, 2014

Deputy VanBennekom testified he was informed by a jailer the following morning that Defendant wanted to talk to him. On cross-examination, however, VanBennekom admitted that his report does not say anything about Defendant requesting to meet with him. VanBennekom met Defendant in the lobby, where he requested to make a phone call to obtain a ride. Defendant then accompanied VanBennekom back to an interview room at the sheriff's office, where Defendant provided his wife's phone number and VanBennekom initiated the call. The events in the interview room were audio-recorded and video-recorded, as found on Government's Exhibit 3.

At the beginning of the interview, Deputy VanBennekom told Defendant:

> I just want you to understand, you're not in custody right now.
> You don't have to talk to me or anything like that. You don't
> have to answer any questions. If you want to get up and leave
> and wait in the lobby, that's your right to do that, okay?

Defendant responded "okay." A few minutes later, VanBennekom and Defendant had the following exchange:

---

[5] The log, identified as Defendant's Exhibit B, is found at docket number 38-1.

| VANBENNEKOM: | "Just so you know what your rights are, I'm going to read you your rights one more time, okay?" |
|---|---|
| DEFENDANT: | "So, I am under custody?" |
| VANBENNEKOM: | "No, you're not; you're not under custody, but I just want you to understand your rights, okay?" |

VanBennekom then read Defendant his *Miranda* rights from a card and asked "do you understand that?" Defendant responded "yeah," and then made some comment that I was unable to understand. VanBennekom replied: "nope, you're free to go." Defendant then made various incriminating statements, including "I had planned to sell the gun." The interview ended at about 11:00 a.m., just eight minutes after it began.

## IV.  DISCUSSION

Defendant's motion to suppress and supporting brief raise three issues: First, Defendant asserts that because he was not given a *Miranda* warning at the scene, statements made by him in response to questions by Deputy VanBennekom are inadmissible at trial. Second, Defendant claims the warrantless search of his vehicle was violative of the Constitution. Third, Defendant argues that statements he made to VanBennekom at the sheriff's office on the following morning must be suppressed. In his supplemental brief, Defendant addresses a fourth issue which was raised at the time of hearing:  Defendant asserts that statements made to the jailer while in custody are inadmissible.

### A.  Statements at the Scene

When Deputy VanBennekom responded to the scene on August 5, he asked Defendant a few preliminary questions while Defendant was sitting in his vehicle. Defendant was then placed in VanBennekom's patrol car, where VanBennekom asked additional questions. Defendant argues that because he was not given a *Miranda* warning

9

at the scene, statements made by him in response to VanBennekom's questions are inadmissible. In its resistance, the Government advises the Court that it "does not intend to use in its case in chief any statements made by defendant on August 5, 2014."[6] Accordingly, it is unnecessary for the Court to determine whether statements made by Defendant on August 5 are admissible.

### B. Vehicle Search

Next, Defendant argues that the warrantless search of his vehicle violated the Fourth and Fourteenth Amendments. In its resistance, the Government asserts that at least two exceptions to the warrant requirement apply: First, the firearm was seized during a valid inventory search; and second, the firearm was seized pursuant to a valid search incident to arrest. In its supplemental resistance, the Government also argues that the search was valid pursuant to the automobile exception and, in any event, the inevitable discovery rule applies. Notably, the Government does *not* argue the consent exception, even though Defendant made statements at the scene which could be construed as consent.

### 1. Inventory Search

Nearly 40 years ago, the United States Supreme Court concluded that a properly conducted inventory search was not unreasonable and, therefore, not violative of the Fourth Amendment. *See South Dakota v. Opperman*, 428 U.S. 364 (1976). Recently, the Eighth Circuit Court of Appeals summarized the law regarding inventory searches:

> Inventory Searches are one exception to the general rule that searches conducted without a warrant are unreasonable. The purpose of an inventory search is to protect the "owner's property while it remains in police custody," as well as to protect "police against claims or disputes over lost or stolen property" and "from potential dangers." An inventory search must "be reasonable under the totality of the circumstances and may not be a ruse for general rummaging in order to discover

---

[6] Government's Brief (docket number 33-1) at 10.

incriminating evidence." "The reasonableness requirement is met when an inventory search is conducted according to standardized police procedures, which generally remove the inference that the police have used inventory searches as a purposeful and general means of discovering evidence of a crime." However, "inventory searches need not be conducted in a totally mechanical, all or nothing fashion." And, "even when law enforcement fails to conduct a search according to standardized procedures, this does not mandate the suppression of the evidence discovered as a result of the search." "There must be something else; something to suggest the police raised 'the inventory-search banner in an after-the-fact attempt to justify' a simple investigatory search for incriminating evidence."

*United States v. Smith*, 715 F.3d 1110, 1117-18 (8th Cir. 2013) (internal citations omitted).

Here, Deputy VanBennekom determined almost immediately that Defendant was intoxicated and would not be permitted to drive. Because Defendant's vehicle was in a lane typically used by customers to drive from the Casey's to a nearby hotel, and to protect its contents against any loss, a decision was made to tow the vehicle to the county impound lot. To assist VanBennekom and to permit him to transport Defendant to jail, Trooper Degen agreed to facilitate the towing of the vehicle and conduct an inventory of its contents.

The Iowa State Patrol procedure for towing vehicles authorizes an officer to impound a vehicle if the vehicle "reasonably appears to a peace officer to constitute a traffic hazard if it remains where it is situated at the time of arrest" or "[t]o protect the vehicle from theft." *See* Iowa State Patrol Procedure No. ISP 14-135 (Government's Exhibit 4), ¶ IV(A)(6)(a) and (c). If an officer decides to impound the vehicle, then the officer must "[c]omplete an inventory of all property in the vehicle." *Id.* at ¶ IV(B)(1)(c)(4)(a). Using a clipboard, Trooper Degen inventoried the contents of Defendant's vehicle in anticipation of it being towed and prepared a "Vehicle Towing and

Impound Report" on a form adopted by the Iowa State Patrol. *See* Government's Exhibit 5.

In his supplemental brief, Defendant concedes that an inventory search is a valid exception to the warrant requirement. Defendant argues, however, that his vehicle "was not blocking traffic on a traveled highway," "Casey's did not ask the police to remove the vehicle," and "the Trooper did not contact Connie about coming to get the vehicle rather than having it towed."[7] In support of his argument, Defendant cites *Opperman* and *Riley v. California*, _____ U.S. _____, 134 S. Ct. 2473 (2014). The issue in *Riley* was the constitutionality of a warrantless search of a cell phone. The cell phone was seized during an inventory search of Riley's car, and there was no challenge to the constitutionality of the inventory search.

Defendant has not offered any authority to support his argument that the vehicle could not be towed unless Casey's requested that it be removed from the parking lot, nor has he cited a case suggesting that it is constitutionally mandated that an officer contact Defendant's wife before deciding to tow the vehicle. Both Deputy VanBennekom and Trooper Degen testified that the vehicle was parked in a lane which is typically used to drive between the Casey's store and a nearby hotel. Neither party introduced a diagram or aerial photograph of the scene, but the video recording showing VanBennekom pulling into the Casey's parking lot appears to support the officers' testimony. Accordingly, it could "reasonably appear" to Degen that the vehicle constituted a traffic hazard. In any event, towing the vehicle can be justified pursuant to the Iowa State Patrol policy to protect the vehicle and its contents from theft.

There is no evidence that Trooper Degen failed to comply with the standardized policy when conducting the inventory search. *Compare United States v. Taylor*, 636 F.3d 461 (8th Cir. 2011) (finding that the inventory search exception was inapplicable because

---

[7] Defendant's Supplemental Brief (docket number 38) at 7.

the police did not comply with the department's standardized procedures). Here, Defendant does not claim that Degen failed to comply with the standardized procedures adopted by the Iowa State Patrol. "An inventory search is reasonable and constitutional if it is conducted according to standardized police procedures." *United States v. Garreau*, 658 F.3d 854, 857 (8th Cir. 2011). I believe the warrantless search of Defendant's vehicle falls within the inventory search exception to the warrant requirement, first recognized in *Opperman*.

### 2. Search Incident to Arrest

Alternatively, the Government argues that the search of the vehicle was authorized as a search incident to arrest, another recognized exception to the warrant requirement. In *Arizona v. Gant*, 556 U.S. 332 (2009), the Court discussed this exception in the context of an automobile search. There, the Court clarified its holding in *New York v. Belton*, 453 U.S. 454 (1981), and held that "[p]olice may search a vehicle incident to a recent occupant's arrest only if the arrestee is within reaching distance of the passenger compartment at the time of the search or it is reasonable to believe the vehicle contains evidence of the offense of arrest." *Id.* at 351. Here, the Government concedes in its resistance that "there is little question that defendant was not within reaching distance of his vehicle" when he was arrested.[8] The Government argues, however, that a search of the vehicle incident to arrest was authorized under the second prong in *Gant*. That is, it was "reasonable to believe that the vehicle contain[ed] evidence of the offense of arrest." *Gant*, 556 U.S. at 351.

Here, the "offense of arrest" was driving while impaired. Deputy VanBennekom clearly had probable cause to believe Defendant was under the influence of alcohol or a controlled substance, and in control of his vehicle under Iowa law. VanBennekom observed an open beer bottle in plain view when he initially opened the car door to check

---

[8] Government's Brief (docket number 33-1) at 9.

on Defendant's welfare. It was reasonable for VanBennekom to believe that the vehicle may contain other evidence of operating while impaired. Accordingly, even if the vehicle was not going to be towed, a search for alcohol or controlled substances was authorized as a search incident to arrest. *See also United States v. Hambrick*, 630 F.3d 742, 746 (8th Cir. 2011) (citing *Gant*). Accordingly, I believe this exception provides alternative authority to search Defendant's vehicle at the scene.

### 3. Alternative Arguments

In its supplemental resistance, the Government asserts two additional arguments to support the warrantless search. First, the Government argues that the "automobile exception" applies. Second, the Government argues that the exclusionary rule does not apply because the items found in the vehicle "would have been inevitably discovered during a standard inventory search."

"Under the automobile exception, if a law enforcement officer has probable cause, he may search an automobile without a warrant." *Hambrick*, 630 F.3d at 747 (quoting *United States v. Rodriguez*, 414 F.3d 837, 843 (8th Cir. 2005)). Here, the Government argues there was probable cause to believe Defendant was intoxicated and the vehicle might contain evidence of his intoxication. This argument is essentially identical under the circumstances in this case to the search incident to arrest argument. The Government also asserts that "in light of the presence of shooting targets, there was probable cause to believe that the vehicle might contain a firearm."[9] The Government does not cite any authority for this proposition, however, and I find that it is a reach. Simply because targets are found in a vehicle does not, in my view, establish probable cause to believe that a firearm will be found in the vehicle.

Finally, the Government argues that the inevitable discovery doctrine applies. It is difficult for me to distinguish this argument from the Government's argument regarding

---

[9] Government's Supplemental Resistance (docket number 39) at 6.

an inventory search. In any event, because the inventory search exception and the search incident to arrest exception both authorize a warrantless search of the vehicle in this case, I believe it is unnecessary for the Court to consider the Government's arguments regarding the automobile exception and inevitable discovery doctrine, as found in the supplemental resistance.

### C. Statements to Deputy VanBennekom

Next, Defendant argues that statements which he made in response to Deputy VanBennekom's questioning at the sheriff's office the following morning must be suppressed. Defendant acknowledges that he was given a *Miranda* warning, but argues "a 'mid-stream' *Miranda* warning was not effective and did not provide him with a meaningful opportunity to make an informed choice regarding his right to not provide the police with an admissible statement."[10] The Government asserts that no *Miranda* warning was required and, in any event, Defendant's statement was voluntary.

In support of his argument, Defendant cites cases where a *Miranda* warning was given midway through the questioning. For example, in *United States v. Aguilar*, 384 F.3d 520 (8th Cir. 2004), three officers interviewed the defendant for approximately an hour and a half prior to giving him *Miranda* warnings. During the unrecorded portion of the interview, one of the officers "became angry, kicked his desk, and swore at Aguilar when Aguilar did not respond in a manner anticipated" by the officer. *Id.* at 522. After questioning the defendant for an hour and a half, officers started recording the interview, gave the defendant a *Miranda* warning, and the defendant made various admissions. The tape-recorded portion only lasted approximately 20 minutes. *Id.* Based on these interrogation tactics, the district court determined that Aguilar's confession was involuntary and the Circuit Court affirmed. *See also Missouri v. Seibert*, 542 U.S. 600,

---

[10] Defendant's Brief (docket number 26-1) at 2.

609 (2004) (condemning "the strategy of withholding *Miranda* warnings until after interrogating and drawing out a confession").

In *Aguilar*, the Court identified certain factors to be considered in determining the effectiveness of "midstream" *Miranda* warnings.

> In determining whether *Miranda* warnings delivered midstream are effective, the Court delineated a list of factors for the court to consider. First, the court must address the extent of the first round of interrogation. The court should also address the extent to which the first round and second round of interrogation overlap. Additional factors include the timing and setting of both questioning sessions, including whether a continuity of police personnel existed. Finally, the court should examine the extent to which "the interrogator's questions treated the second round as continuous with the first."

*Aguilar*, 384 F.3d at 524 (citing *Seibert*).

I do not believe the circumstances here comport with the circumstances proscribed by *Seibert* and *Aguilar*. Here, the "first round of interrogation" consisted of a few questions by Deputy VanBennekom while he and Defendant were sitting in his patrol car at the scene. Those questions were directed to Defendant's apparent operation of a motor vehicle while impaired. The "second round of interrogation" took place more than 24 hours later and lasted approximately 8 minutes, including the time it took VanBennekom to read Defendant a *Miranda* warning and advise him repeatedly that he was not in custody and did not have to answer any questions.

The gist of Defendant's argument is that even if he was given a *Miranda* warning, his statements at the sheriff's office on the following morning were not made voluntarily. The Fifth Amendment prohibits the introduction of involuntary statements at trial. *United States v. Bordeaux*, 400 F.3d 548, 560 (8th Cir. 2005). "The Government bears the burden of persuasion and must prove by a preponderance of the evidence that the challenged statements were voluntary." *United States v. LeBrun*, 363 F.3d 715, 724 (8th

16

Cir. 2004). There is no "talismanic definition of 'voluntariness,'" and the Court must determine whether the statement was voluntary by looking at the totality of the circumstances. *Schneckloth v. Bustamonte*, 412 U.S. 218, 224-25 (1973).[11] "A statement is involuntary when it was extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination." *LeBrun*, 363 F.3d at 724.

There is no evidence to support Defendant's argument that his statements were not voluntary. Defendant had not consumed any alcohol for at least 24 hours and a preliminary breath test (PBT) administered more than 12 hours earlier showed that he had no alcohol remaining in his system. While Defendant appeared upset by his circumstances, that does not render his statements involuntary. At the very beginning of the interview, Deputy VanBennekom told Defendant that he was not in custody, did not have to talk to VanBennekom, did not have to answer any questions, and was free to get up and leave. A few minutes later, VanBennekom told Defendant again that he was not in custody. VanBennekom then read Defendant his *Miranda* rights and Defendant indicated he understood his rights. A video recording shows that VanBennekom did not raise his voice or physically intimidate Defendant in any way. The interview was exceedingly short, lasting only a few minutes. In short, there is no basis to conclude Defendant's Fifth Amendment right against self-incrimination was violated.

In his motion, Defendant also asserts a violation of his Sixth Amendment right to counsel. While Defendant does not expand on his argument in his brief, he notes that

---

[11] The issue in *Schneckloth* involved the voluntariness of a consent to search. The Court noted, however, that "[t]he most extensive judicial exposition of the meaning of 'voluntariness' has been developed in those cases in which the Court has had to determine the 'voluntariness' of a defendant's confession for purposes of the Fourteenth Amendment." Accordingly, the Court stated that it was "that body of case law to which we turn for initial guidance on the meaning of 'voluntariness' in the present context." 412 U.S. at 223-24.

counsel had been appointed to represent him in the OWI case prior to the questioning conducted by Deputy VanBennekom on the morning of August 6. The right to counsel is offense specific, however, and simply because he had a Sixth Amendment right to counsel in the OWI case, it does not follow that he had a Sixth Amendment right on a charge of possession of a firearm, which was still under investigation. *Texas v. Cobb*, 532 U.S. 162, 168 (2001) ("A defendant's statements regarding offenses for which he had not been charged were admissible notwithstanding the attachment of his Sixth Amendment right to counsel on other charged offenses."). Because the right to counsel does not attach until a prosecution is commenced, Defendant did not have a Sixth Amendment right to counsel on the firearms charge and, therefore, there can be no violation. *United States v. Edelmann*, 458 F.3d 791, 803 (8th Cir. 2006).[12]

### D. Statements to the Jailer

Finally, Defendant argues that the statement made to the jailer during the early morning hours of August 6 "is not admissible because it was not voluntarily made due to his impaired mental condition and the failure of the Sheriff to provide him with medical treatment."[13] The problem with Defendant's argument is that there is no evidence he was suffering from an "impaired mental condition" or that such condition caused his "will to be overborne." A preliminary breath test (PBT) administered six hours earlier showed Defendant did not have any alcohol remaining in his system. The note in the jail log

---

[12] The Sixth Amendment also encompasses offenses which are related to the charged offense under the test set out in *Blockburger v. United States*, 284 U.S. 299 (1932), but it is undisputed that driving while impaired and possession of a firearm as a felon do not meet such a test. *Cobb*, 532 U.S. at 172-73.

[13] Defendant's Supplemental Brief (docket number 38) at 2.

indicates, however, that Defendant "[s]till is acting in a very strange manner" and "is very irate."[14]

The only case cited by Defendant in support of his argument is *Mincey v. Arizona*, 437 U.S. 385 (1978). There, the defendant "had been seriously wounded just a few hours earlier, and had arrived at the hospital 'depressed almost to the point of coma.'" *Id.* at 398. Defendant was in the intensive care unit and described his pain as "unbearable." *Id.* "He was evidently confused and unable to think clearly about either the events of that afternoon or the circumstances of his interrogation, since some of his written answers were on their face not entirely coherent." *Id.* at 398-99. While being questioned, the defendant "was lying on his back on a hospital bed, encumbered by tubes, needles, and breathing apparatus." *Id.* at 399. The Court found that the defendant was "at the complete mercy" of the interrogating officer and "unable to escape or resist the thrust of [the officer's] interrogation." *Id.*

Here, on the other hand, the record is Defendant was "acting in a very strange manner" and was "very irate." A few hours earlier, he woke up, demanded his medications, and was told no. Defendant then "proceeded to punch the door and walls several times." Defendant was warned to stop and he then laid down. Obviously, Mincey's condition while being interrogated differed substantially from Defendant's condition during the 3:15 bed check.

Defendant does *not* argue in his supplemental brief that a *Miranda* warning was required by the jailer at the 3:15 a.m. bed check. The jailer credibly testified that he did not ask Defendant any questions about the pending charges and, in fact, had not looked at the file and did not know the nature of the charges. For whatever reasons, Defendant volunteered information regarding selling a gun and his meth use. Because Defendant was

---

[14] August 5, 2014 Jail Inmate Observation Log, Defendant's Exhibit B (docket number 38-1) at 3.

not "interrogated" by the jailer, no *Miranda* warning was required. As set forth above, however, the Court must consider whether a defendant was advised of his rights when determining if his statements are voluntary.

In determining voluntariness, "a court looks at the totality of the circumstances and must determine whether the individual's will was overborne." *United States v. Syslo*, 303 F.3d 860, 866 (8th Cir. 2002). *See also United States v. Williams*, 720 F.3d 674, 691 (8th Cir. 2013). Here, during previous bed checks, the jailer observed Defendant to be "agitated" and "twitching" while sleeping. When the jailer checked at 3:15 a.m., however, Defendant was sitting up, and the jailer decided to enter the cell and ask if he was okay. Nothing which the jailer did caused Defendant's "will to be overborne" and Defendant's statements are admissible at trial.

## V. SUMMARY

In summary, I believe the warrantless search of Defendant's vehicle at the scene was authorized under both the inventory search exception and the search incident to arrest exception. Regarding the statements made by Defendant to the jailer in the early morning hours of August 6 and the statements made to Deputy VanBennekom during an interrogation shortly after Defendant was released from custody, I believe the Government has met its burden of proving that the statements were voluntary. The statements made to the jailer did not result from an interrogation and, therefore, a *Miranda* warning was not required. Similarly, a *Miranda* warning was not required when Defendant was questioned by Deputy VanBennekom, because Defendant was not then in custody. Nonetheless, a *Miranda* warning was given and Defendant was repeatedly told that he was free to leave and not answer any questions. In any event, Defendant's statements were not "extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination," and were made voluntarily. *LeBrun*, 362 F.3d at 724. I can find no constitutional violation.

20

## VI. RECOMMENDATION

For the reasons set forth above, it is respectfully recommended that the Motion to Suppress (docket number 26) filed by the Defendant be **DENIED**. The parties are advised, pursuant to 28 U.S.C. § 636(b)(1), that within fourteen (14) days after being served with a copy of this Report and Recommendation, any party may serve and file written objections with the district court. *The parties are reminded that pursuant to Local Rule 72.1, "[a] party asserting such objections must arrange promptly for a transcription of all portions of the record the district court judge will need to rule on the objections." Accordingly, if the parties are going to object to this Report and Recommendation, they must promptly order a transcript of the hearing held on December 16, 2014.*

DATED this __3/st__ day of December, 2014.

JON STUART SCOLES
CHIEF MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA